UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICK BELLINGHAUSEN,

       Plaintiff,

    v.

TRACTOR SUPPLY COMPANY,

       Defendant.

Case No.  13-cv-02377-JSC

**ORDER RE: MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

Re: Dkt. Nos. 77, 80

      In this pre-certification wage and hour class action dispute, Plaintiff Patrick Bellinghausen ("Plaintiff") alleges that, among other things, Defendant Tractor Supply Company ("Defendant") failed to implement legally compliant meal and rest period policies.  On November 26, 2014, the Court issued an Order granting the parties' joint Motion for Preliminary Approval of Class Action Settlement.  (Dkt. No. 72.)  Now pending before the Court are Plaintiff's motion for final approval of a class action settlement (Dkt. No. 80), and Plaintiff's unopposed motion for attorneys' fees, costs, and collective incentive award (Dkt. No. 77).  Defendant does not oppose the motions.  The Court held a fairness hearing regarding final approval and fees on March 19, 2015.  Having considered the arguments of counsel and the papers submitted, the Court GRANTS final approval of the settlement agreement; GRANTS the requested attorneys' fees and costs; and GRANTS IN PART the requested incentive award for the class representative as set forth below.

## BACKGROUND

      Plaintiff, a California citizen, worked for Defendant, a Delaware corporation, in an hourly position as retail-store clerk from approximately April 2010 to January 2013.  (Dkt. No. 46 ¶ 2.) Plaintiff's Third Amended Complaint ("TAC") includes seven causes of action:  1) Failure to Provide Meal Periods (California Labor Code §§ 204, 223, 226.7, 512, and 1198); 2) Failure to

United States District Court
Northern District of California

Provide Rest Periods (California Labor Code §§ 204, 223, 226.7, and 1198); 3) Failure to Pay Hourly and Overtime Wages (California Labor Code §§ 223, 510, 1194, 1197, and 1198); 4) Failure to Provide Accurate Wage Statements (California Labor Code § 226); 5) Failure to Timely Pay All Final Wages (California Labor Code §§ 201-203); 6) Unfair Competition (California Business and Professions Code §§ 17200, et seq.); and 7) Civil Penalties (California Labor Code §§ 2698, et seq.).  (Dkt. No. 46.)

Plaintiff filed his original complaint in Alameda County Superior Court on April 25, 2013. Defendant removed the case to federal court approximately one month later, asserting jurisdiction under the Class Action Fairness Act.  Plaintiff subsequently filed a First Amended Complaint, which this Court dismissed with leave to amend for failure to state a claim under Rule 12(b)(6). (Dkt. No. 32.)  The Court then dismissed Plaintiff's Second Amended Complaint under Rule 12(b)(6).  (Dkt. No. 44.)  Defendant's subsequent motion to dismiss Plaintiff's TAC was denied, and Defendant answered the TAC on February 18, 2014.

On November 20, 2014, the Court held a hearing on the parties' joint motion for preliminary approval of their settlement agreement.  (Dkt. No. 72.)  At that hearing, the Court directed the parties to submit a revised notice of settlement, revised proposed order, and a stipulation regarding these revisions.  The parties timely filed these materials, which all ensured that class members were notified that they could object not only to the settlement, but also—or only—to the request for attorneys' fees, costs, and the enhancement award sought for the named plaintiff. (*See* Dkt. No. 73.)  On November 26, 2014, the Court granted preliminary approval of the Settlement.  (Dkt. No. 74.)  In accordance with the order granting preliminary approval, Plaintiff filed his motion for attorneys' fees, costs, and a representative incentive award on January 16, 2015.  (Dkt. No. 77.)  Having completed the notice process as set forth in the preliminary approval order, Plaintiff filed a motion for final approval on February 19, 2015.  (Dkt. No. 80.) The Court held a hearing on the motions on March 19, 2015.

## SETTLEMENT PROPOSAL

On April 2, 2014, the parties participated in a full day of mediation with Susan Haldeman. "Both parties prepared detailed mediation briefs, and through the use of experts the parties

2

developed models for estimating Defendant's potential liability exposure in this action on a class-wide basis." (Dkt. No. 69-1 ¶ 9.)  Also in anticipation of mediation, Defendant produced "hundreds of pages of documents." (*Id.* ¶ 8.)  "These documents included, among other things, policies relating to meal and rest periods, payroll, time keeping, vacation pay, and Plaintiff's personnel file.  Defendant also produced more than one million lines of payroll data." (*Id.*)  In the weeks that followed the mediation, the parties—with the continued assistance of the mediator—continued engaging in their "arm's length" negotiations and ultimately agreed to the settlement now before the Court. (*Id.* ¶ 10.)

The parties' proposed settlement agreement as it existed prior to the final approval hearing provides a settlement fund of $1,000,000.  Reduced from that fund are (1) attorneys' fees up to 30 percent of the fund ($300,000)[1]; (2) actual litigation costs up to $30,000[2]; (3) an award to Plaintiff up to $20,000, constituting a $5,000 incentive award plus a $15,000 enhancement; (4) payment of $35,000 in civil penalties to the Labor Workforce and Development Agency ("LWDA"); and (5) reasonable claims administration expenses. (Dkt. No. 69-2 ¶¶ 4.1, 9.1—9.4.)  The remaining funds are then distributed to the class members who do not opt out of the class.  Class members will receive a *pro rata* share of the fund based on his or her "compensable hours"[3] worked during the class period, less statutorily required tax withholdings. (*Id.* ¶ 4.4.)  The number of compensable hours will be disclosed to each class member in the notice of settlement; further, each class member will be given an individualized estimated figure of monetary recovery based on their number of compensable hours.  All checks to non-objecting class members not cashed within 120 days of mailing will escheat to the State of California and be administered in accordance with California's Unclaimed Property Law, Cal. Civ. Pro. §§ 1500-1509. (*Id.* ¶ 4.7)  No settlement

---

[1] Class counsel is only seeking 25 percent of the total settlement fund in attorneys' fees. (*See* Dkt. No. 80 at 9 n.2.)

[2] Class counsel is only seeking $21,747.28 in costs. (Dkt. No. 77-3.)

[3] The settlement agreement defines "compensable hours" as "the actual number of hours worked by the Settlement Class member as a nonexempt employee in California during the Class Period." (Dkt. No. 69-2 ¶ 4.4)  This number will be determined from Defendant's payroll records, and, as explained below, class members will be able to dispute their assigned compensable hours number.

United States District Court
Northern District of California

funds will revert to Defendant.

## DISCUSSION

Judicial policy strongly favors settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "To vindicate the settlement of such serious claims, however, judges have the responsibility of ensuring fairness to all members of the class presented for certification." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Where the "parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Id.* In the first stage of the process, as here, the court preliminarily approves the settlement pending a final fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class. *See Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012). "At the [final] fairness hearing, presently before the Court, after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014) (citing *Diaz v. Trust Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must reach a final determination as to whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See id.*; *Telecommc'ns Coop. v. DIRECTV, Inc.*, 221 F.R.D. 525, 535 (C.D. Cal. 2004).

## I.    Motion for Final Approval of Class Action Settlement

### A.    Final Class Certification of the Settlement Class

#### 1.    *Rule 23(a) Requirements*

Class actions must meet the following requirements prior to certification:
1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and 4) the representative parties will fairly and adequacy protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and adequacy of representation, respectively. *Leyva*, 716 F.3d at 512. The Court must determine that

4

Plaintiffs have satisfied their burden to demonstrate that the proposed class satisfies each element of Rule 23. These requirements "demand undiluted, even heightened attention in the settlement context . . . for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

In the Court's Order granting preliminary approval of the settlement, the Court found that the putative class satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a). The Court is unaware of any changes that would alter its analysis, and the parties did not indicate either in their papers or at the fairness hearing that any such developments had occurred. (*See* Dkt. No. 80-1 ¶ 11.) Thus, the Court concludes that all four of Rule 23(a)'s requirements have been met.

### 2.    *Rule 23(b) Requirements*

In addition to meeting the requirements of Rule 23(a), a potential class must also meet one of the conditions outlined in Rule 23(b)—of relevance here, the condition that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In evaluating the proposed class, "pertinent" matters include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). In its Order granting preliminary approval of the settlement, the Court found that both prerequisites of Rule 23(b)(3) were satisfied. (Dkt. No. 74 at 7-8.) The Court is unaware of any changes that would alter its analysis, and that parties did not indicate either in their

United States District Court
Northern District of California

papers or at the fairness hearing that any such developments had occurred.  (*See* Dkt. No. 80-1 ¶ 11.)  There were no objections by individual class members who claim to have an interest in controlling the prosecution of this action or related actions.[4]

### 3.   *Rule 23(c)(2) Notice Requirements*

Finally, if the Court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Rule 23(c)(2) governs both the form and content of a proposed notice.  *Se Ravens v. Iftikar*, 174 F.R.D. 651, 658 (N.D. Cal. 1997) (citation omitted).  The notice must be "reasonably certain to inform the absent members of the plaintiff class," but Rule 23 does not require actual notice.  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

As the settlement agreement provides, the settlement administrator, Rust Consulting, mailed notice of the settlement to the last known address of all 1,318 class members contained on the class list on December 17, 2014.  (Dkt. No. 77-8 ¶ 11; *see* Dkt. No. 69-2 ¶¶ 1.2 (establishing Rust Consulting as settlement administrator), 5.1-5.11 (setting forth notice requirements and procedures).)  Notice for 99 class members were returned as undeliverable, though 51 of those class members received notice by email.  (Dkt. No. 80-2 ¶ 2.)  In any event, the settlement administrator received updated addresses for three of the 99 undeliverable class notices and performed "skip traces" to determine updated addresses for the remaining 96.  (*Id.*)  The settlement administrator identified more current addresses for 83 of those 96 class members.  (*Id.*)  Ultimately, four were returned as undeliverable a second time.  (*Id.*)  The Court is satisfied that this system of providing notice was reasonably calculated to provide notice to class members and was the best form of notice available under the circumstances.

Likewise, the notice itself clearly identifies the options available to putative class members—do nothing; object to the terms of the settlement, the scope of attorneys' fees, and/or

---

[4] The Notice of Settlement directed class members who wished to object to file their objection with the Court and serve a copy of their objection on the parties' attorneys.  The claims administrator indicated that as of February 19, 2015, it had not received any objections.  (Dkt. No. 80-2 ¶ 7.)  There were no objections voiced at the hearing.

United States District Court
Northern District of California

the amount of the enhancement incentive award for the named Plaintiff; or opt out—and also
thoroughly explained the nature and mechanics of settlement.  (*See* Dkt. No. 73-1.)  The content of
the notice is therefore sufficient to satisfy Rule 23(c)(2)(B).  *See Churchill Vill., L.L.C. v. Gen.
Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms
of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to
come forward and be heard.'" (citation omitted)).

*   *   *

Because the settlement class satisfies Rules 23(a) and 23(b)(3), and notice was sufficient in
accordance with Rule 23(c), the Court will grant final class certification.

    B.    <u>Approval of the Settlement</u>

Having determined that class treatment is warranted, the Court now addresses whether the
terms of the parties' settlement appears fair, adequate, and reasonable under Rule 23(e).  In
making this determination, a court typically considers the following factors initially set forth in
*Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004):  "(1) the strength of
the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3)
the risk of maintaining class action status throughout the trial; (4) the amount offered in
settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the
experience and views of counsel; (7) the presence of a governmental participant; and (8) the
reaction of the class members of the proposed settlement."  *Id.* at 575.  The court need not
consider all of these factors, or may consider others.  *In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935, 942 (9th Cir. 2011) ("The factors in a court's fairness assessment will naturally vary
from case to case.").

But in *Bluetooth*, the Ninth Circuit explained that when "a settlement agreement is
negotiated *prior* to formal class certification, consideration of these eight . . . factors alone is"
insufficient.  *Id.*  In these cases, courts must show not only a comprehensive analysis of the above
factors, but also that the settlement did not result from collusion among the parties.  *Id.* at 947.
Because collusion "may not always be evident on the face of settlement, . . . [courts] must be
particularly vigilant not only for explicit collusion, but also for more subtle signs that class

United States District Court
Northern District of California

counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.*   The court identified three such signs:

> (1) when class counsel receives a disproportionate distribution of the settlement, or when the class receives no monetary distribution but counsel is amply awarded[;]
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds without objection by the defendant (which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class[;] and
>
> (3) when the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund.

*Id.* (internal quotation marks and citations omitted).  For the reasons stated below, on balance a review of these factors indicates that this Settlement is fair, adequate, and reasonable.

### 1.   The Churchill Factors

#### a.   Strength of Plaintiff's Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

One important consideration is the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement.  *DIRECTV*, 221 F.R.D. at 526.  Although this action reached settlement before the Court had occasion to consider the merits of the claims, the Court need not reach an ultimate conclusion about the merits of the dispute now, "for it is the very uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that induce consensual settlements."  *Officers for Justice v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).   To that end, there is no "particular formula by which th[e] outcome must be tested."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, at *9 (N.D. Cal. Apr. 22, 2010).  Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice."  *Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted).  "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by

United States District Court
Northern District of California

considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.*

Here, the class action Third Amended Complaint ("TAC") alleged that Defendant failed to pay the named Plaintiff and the entire class for vested vacation time, failed to provide them with meal or rest periods, failed to pay premium wages for unprovided meal and rest periods, failed to pay at least minimum wages for all hours worked, failed to pay overtime wages in part by failing to include all applicable remuneration in calculating the regular rate of pay, failed to provide accurate written wage statements, and failed to pay the total sum of final wages following separation from employment in violation of various California Labor Code provisions. (Dkt. No. 58 ¶ 1.) While Plaintiff believes his claims are meritorious, he concedes that recovery might be precluded based on successful affirmative defenses and the possibility that good faith disputes as to the viability of the claims could preclude penalty awards under California law. (Dkt. No. 80-1 ¶ 14 14.) Moreover, Plaintiff concedes that the class would face significant hurdles if this case were to proceed to litigation of the merits, such as questions about the viability of affirmative defenses, the possible unavailability of penalty awards; and the risk of appeal further delaying Plaintiffs' awards. (*See* Dkt. No. 80-1 ¶ 14.) And indeed, Defendant challenged both the propriety of maintaining this lawsuit as a class action and the sufficiency of each of seven causes of action, and also asserted no fewer than 29 affirmative defenses. (Dkt. No. 58 at 23-31.) This posture demonstrates a significant risk that litigation might result in a lesser recover for the class or no recovery at all.

In light of the risks and costs of continued litigation, the immediate rewards to class members are preferable. Specifically, each class member is offered a *pro rata* share of the net settlement consideration based on the number of hours he worked as set forth in Defendant's payroll records. (Dkt. No. 69-2 ¶ 4.4.) The average amount of recovery is just north of $454.48. (*See* Dkt. No. 80 at 15.) The settlement administrator must make disbursements to the entire class within 20 days of the Court's final approval order. (*Id.* ¶ 8.2.) Although Plaintiffs might have received more if they proceeded through litigation and prevailed on the merits of their case, as Plaintiff points out, a large portion of the potential recovery would be penalty payments only 25

1    percent of which would revert to the class; thus, the value of proceeding through litigation is not

2    as high.  Moreover, the benefit of receiving this money sooner rather than later has its own value.

3        Given the challenges Plaintiffs would face should this case move forward instead of

4    resolving, in contrast to the finality and speed of recovery under the parties' agreement, this factor

5    weighs in favor of approving the Settlement.

6                        b.   Risk of Maintaining Class Action Status Throughout Trial

7        In considering the third factor, the Court looks to the risk of maintaining class certification

8    if the litigation were to proceed.  Although the parties agree that certification for the purposes of

9    this settlement is appropriate, from the outset of this litigation Defendant has raised arguments that

10   individual issues may defeat certification.  (*See, e.g.*, Dkt. No. 58 at 29.)  Indeed, Plaintiff

11   concedes that there is a significant risk that class action status might not be maintained throughout

12   trial as potential differences among the plaintiffs' claims came to light due to, among others,

13   "differences between the individual stores where different class members worked and/or

14   differences in circumstances surrounding the end of each employee's employment[.]" (Dkt. No.

15   80-1 ¶ 14.)  In light of these difficulties in certifying the class, the Court finds that this factor

16   weighs in favor of approving the Settlement.

17                        c.   Amount Offered in Settlement

18       The fourth fairness factor, the amount of recovery offered, also favors final approval of the

19   Settlement.  When considering the fairness and adequacy of the amount offered in settlement, "it

20   is the complete package taken as a whole, rather than the individual component parts, that must be

21   examined for overall fairness."  *DIRECT TV*, 221 F.R.D. at 527 (citation omitted).  "[I]t is well-

22   settled law that a proposed settlement may be acceptable even though it amounts to only a fraction

23   of the potential recovery that might be available to the class members at trial."  *Id.* (collecting

24   cases).

25       Here, the parties have agreed that Defendant will establish a settlement fund in the amount

26   of $1,000,000.  (Dkt. No. 69-2 ¶ 4.1.)  In the Order granting preliminary approval, the Court noted

27   that the parties, their experts, and their private mediator estimated Defendant's potential liability to

28   be between $3,739,868 and $11,565,677 for all of the claims, and therefore the settlement fund

United States District Court
Northern District of California

10

equals between approximately 27 percent and nine percent of Defendant's total potential liability exposure before deductions.  While the Court determined that these percentages were potentially fair enough for preliminary approval, it expressed concern that they may be inaccurate for failure to include Plaintiffs' potential award of statutory attorneys' fees on certain claims.  Thus, the Court directed the parties to include their estimation for the recovery of potential statutory fees and costs along with potential recovery of monetary damages.   The parties have done so: including potential attorneys' fees and costs as calculated in Plaintiff's motion for attorneys' fees, Defendant's potential liability increases to between $3,930,540 and $11,756,349.  (*See* Dkt. No. 80-1 ¶ 13.)  Thus, the agreed-upon $1,000,000 settlement fund represents between 25.4 percent and 8.5 percent of Defendant's total potential liability exposure.

Notably, a substantial portion of Defendant's total potential liability exposure would not translate into awards to class members at all.  Between $50,000 and $3,000,000 of the estimated potential liability is comprised of PAGA penalties, but these large penalties do not necessarily translate into take-home awards for members of the class for two reasons.  First, the penalties themselves, and their amount, are discretionary.  *See* Cal. Lab. Code § 2699(e)(2).  Moreover, even if the full amount were awarded, by law only 25 percent of such penalties can revert to class members, while the remaining 75 percent would be appropriated to the state Labor and Workforce Development Agency for enforcement of labor laws and education of employers and employees about their rights under state law.  *See* Cal. Lab. Code § 2699(i).  Thus, between $37,500 and $2,250,000 of the estimated potential liability exposure would not revert to class members. Keeping these reductions in mind, the class would only stand to receive between $3,702,368 and $9,315,677.[5]  From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential recovery.  The Court is satisfied that these numbers are fair.  *See DIRECTV*, 221 F.R.D. at 527

This is particularly true given that here, of the 1,315 class members who received notice of the settlement, no objector has stepped forward to contest the amount offered and just nine opted

---

[5] Calculated as the total amount of potential liability exposure included statutory awards of attorneys' fees less the 75 percent that state appropriation of potential PAGA penalties.

United States District Court
Northern District of California

out of the settlement.  (*See* Dkt. No. 80-2 ¶¶ 5, 7.)  That "the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).  The Court therefore concludes that the amount offered in settlement also weighs in favor of final approval.

d.  Extent of Discovery Completed & the Stage of the Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table."  *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998).  Rather, the court's focus is on whether "the parties carefully investigated the claims before reaching a resolution."  *Ontiveros*, 303 F.R.D. at 371 (citation omitted).

Here, the parties have litigated several motions to dismiss.  In addition, the parties conducted substantial formal and informal discovery in connection with that litigation and to prepare for mediation.  (Dkt. No. 80-1 ¶¶ 7-8.)  This discovery involved the exchange of information and documents about the claims alleged and Defendant's defenses.  (*Id.* ¶ 7.)  In particular, Defendant produced—and Plaintiff analyzed—hundreds of pages of documents, including "policies relating to meal and rest periods, payroll, time keeping, vacation pay, and Plaintiff's personnel file" along with more than one million lines of payroll data to develop models for estimating Defendant's potential liability exposure.  (*Id.*)

After having had the benefit of this discovery, both sides prepared detailed mediation briefs and—with the use of experts—developed models for estimating Defendant's potential liability exposure.  (*Id.* ¶ 8.)  The parties participated in a full day mediation session in Los Angeles with Susan Haldeman, whom plaintiff's counsel explains is "a highly respected mediator with extensive experience in wage and hour class action matters[.]"  (*Id.* ¶ 8.)  Although the parties did not reach a resolution during that full-day session, they continued to negotiate with the mediator's assistance for several weeks and eventually arrived at the settlement agreement before the Court with the benefit of a mediator's proposal.  In wage-and-hour cases where, as here, the parties have engaged in discovery, participated in mediation, and relied a mediator's proposal in

reaching a settlement, courts have found settlement appropriate.  *See, e.g.*, *Ontiveros*, 303 F.R.D. at 371 ("The parties' use of mediation, which took place after significant discovery, and their reliance on the mediator's proposal in settling demonstrates the parties considered a neutral opinion in evaluating the strength of their arguments . . . and weigh[s] in favor of settlement." (citation omitted)).

The Court therefore finds that the extent of discovery in this case favors approval of the Settlement.

### e.   Experience and Views of Counsel

The experience and views of counsel also weigh in favor of approving the settlement. Class counsel and counsel for Defendant have substantial experience in class action wage and hour litigation.   In particular, Plaintiff's counsel has litigated numerous wage-and-hour class action cases—including in actions alleging failure to provide meal and/or rest periods, and failure to pay wages, provide accurate wage statements, or final wage payments, as here—and is experienced in the field.  (Dkt. No. 77-1 ¶¶ 4-5; *see also* Dkt. No. 69-1 ¶¶ 19-20.)  Class counsel believes the settlement properly balances the monetary exposure that the class stands to gain with the magnitude of risk of continued litigation—at bottom, that the settlement is fair, adequate and reasonable.  (Dkt. No. 80-1 ¶ 14; *see also* Dkt. No. 80 at 15 ("Class Counsel is [ ] of the opinion that the Settlement represents an excellent bargain for the class, given the inherent risks, hazards, and expenses of carrying the case through trial.").)  Given counsel's experience in this field, his assertion that the settlement is fair, adequate, and reasonable support final approval of the settlement.  *See Hanlon*, 150 F.3d at 1026; *Rodriguez*, 2007 WL 2827379, at *8 ("The trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

### f.   Presence of a Government Participant

Although no government entity is a party to this action, the United States Attorney General, as well as the Attorneys General for the relevant states, were notified of the settlement pursuant to the notice provision of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. (*See* Dkt. No. 80-3 ¶ 2 & Exs. 1 & 2.)  "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA

United States District Court
Northern District of California

13

presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures. *Garner*, 2010 WL 1687832, at *14. To date, no state or federal official has raised any objection or concern regarding the settlement.

g.   Reaction of the Class Members

The settlement administrator identified 1,318 participating class members and ultimately reported only four of the notices as undeliverable because it was unable to find a new correct address. (Dkt. No. 80-2 ¶ 2.) As of this date, the Court is not aware of a single class member who has filed an objection to the settlement as a whole, to the award . (*Id.* ¶ 7.) Nine class members opted out (although one exclusion form was not signed). (*Id.* ¶ 5.) Eleven class members have already initiated the process set forth in the settlement agreement to dispute the parties' determination of the number of compensable hours worked during the class period by submitting a settlement allocation form. (*Id.* ¶ 4; *see also* Dkt. No. 69-2 ¶ 5.7 (describing the procedure for disputes regarding compensable hours).) "Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the proposed class settlement action are favorable to the class members." *Garner*, 2010 WL 1687832, at *14 (internal quotation marks omitted); *see, e.g.*, *Ontiveros*, 303 F.R.D. at 371-72; *DIRECTV*, 221 F.R.D. at 529. Thus, here, the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Garner*, 2010 WL 1687832, at *14 (internal quotation marks and citation omitted).

2.   *The Bluetooth Factors*

Given that this settlement was reached prior to class certification, the Court must look beyond the *Churchill* factors and examine the settlement for evidence of collusion with an even higher level of scrutiny. *See Bluetooth*, 654 F.3d at 946. The question here is whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. Two of the three warnings signs that the Ninth Circuit identified arguably are present. However, for the reasons described below, even if those warning signs exist, however, the Court finds no evidence of collusion between the parties. *See Bluetooth*, 654 F.3d at 950 (noting that upon remand the

14

1   district court may uphold the settlement notwithstanding the presence of all three of the *Bluetooth*

2   warning signs).

3       First, the Court compares the payout to the class (actual and expected) to the unopposed

4   claim of fees by class counsel.  *See Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL

5   4831157, at *6 (N.D. Cal. Oct. 12, 2011).  The settlement agreement provides that Plaintiff is

6   entitled to an award of attorneys' fees in the amount of 30 percent of the settlement fund; that is,

7   $300,000.  (Dkt. No. 69-2 ¶ 9.1.)  In its Order granting preliminary approval of the settlement

8   agreement, the Court expressed doubt that this 30 percent fee arrangement was appropriate given

9   the typical 25 percent benchmark in the Ninth Circuit.  Plaintiff has now cured this potential defect

10  by seeking $250,000 in attorneys' fees—effectively lowering its percentage to the Ninth Circuit's

11  benchmark amount.  However, in the context of the *Bluetooth* collusion analysis, the amount of

12  attorneys' fees is measured against the class's actual payout from the fund, rather than the full

13  amount.  *See Harris*, 2011 WL 4831157, at *6; *see also, e.g.*, *LaGarde v. Support.com, Inc.*, No. C

14  12-0609 JSC, 2013 WL 1283325, at *8 (N.D. Cal. Mar. 26, 2013).  Using Plaintiff's 25 percent

15  request, after making the deductions for attorneys' fees, costs, the named Plaintiff's incentive

16  award and enhancement, and the fee for the settlement administrator, and the portion of the PAGA

17  penalties to go to state funds, the total potential payout to the class is $649,000.  Compared to that

18  figure, the $250,000 request for attorneys' fees is reasonable.  The Court thus concludes that this

19  *Bluetooth* warning sign, though perhaps initially a red flag, is not a sign of collusion.

20      In addition, the second warning sign—a "clear sailing" provision—is present here:  the

21  settlement agreement includes a provision whereby Defendant will not object to Plaintiff's request

22  for fees up to $300,000.  (*See* Dkt. No. 69-2 ¶ 9.1.)  "The very existence of a clear sailing

23  provision increases the likelihood that class counsel will have bargained away something of value

24  to the class."  *Bluetooth*, 654 F.3d at 948 (internal quotation marks omitted).  "Therefore, when

25  confronted with a clear sailing provision, the district court has a heightened duty to peer into the

26  provision and scrutinize closely the relationship between attorneys' fees and benefit to the class,

27  being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested."

28  *Id.*

United States District Court
Northern District of California

15

1    The third warning sign—whether the parties have arranged for fees not awarded to the

2    class to revert to defendants rather than be added to the class fund, *see Bluetooth*, 654 F.3d at

3    948—is not present here, where the non-reversionary settlement agreement provides that any

4    remaining fees escheat to the state. (*See* Dkt. No. 69-2 ¶ 4.7.)

5    Notwithstanding the existence of two of the three warning signs, the Court finds that the

6    settlement did not result from, nor was influenced by, collusion.  First, the settlement adequately

7    satisfies the class members' claims, which is reflected at least in part by the complete absence of

8    objections to the settlement.  Moreover, the Court finds no evidence of explicit collusion here,

9    where, after litigating several rounds of motions to dismiss, the parties engaged in settlement talks

10   overseen by a neutral mediator for several weeks before agreeing on this settlement.  Counsel has

11   asserted that "[a]t all times, the [p]arties' negotiations were adversarial, non-collusive, and at

12   arm's length."  (Dkt. No. 80-1 ¶ 10.)  Considering the scope of litigation and the nature of the

13   negotiations process, the Court is satisfied that the settlement is the product of successful arms-

14   length negotiations.  *See Bluetooth*, 654 F.3d at 948 (holding that participation of a mediator is not

15   dispositive, but is "a factor in favor of a finding of non-collusiveness").

16                                                   *   *   *

17   The eight fairness factors suggest that the settlement is fair, adequate and reasonable, the

18   Court is satisfied that the settlement was not the result of collusion between the parties, and there

19   are no objections to address.  For each of these reasons, the settlement agreement passes muster

20   under Rule 23(e) and final approval is appropriate.

21   **II.      Motion for Attorneys' Fees, Reimbursement of Costs, and Enhancement Fee**

22   Next, the Court must determine whether the requested attorneys' fees and expenses, the

23   settlement administrator cost, and the class representative's incentive award and enhancement are

24   fair and reasonable.  For the reasons set forth below, the Court will award the full amount of

25   attorneys' fees, litigation costs, and administration costs sought, but will reduce the amount of

26   incentive award that Plaintiff seeks.

27          A.      Attorneys' Fee Award

28   When a negotiated class action settlement includes an award of attorneys' fees, the fee

award must be evaluated in the overall context of the settlement.  *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002).  At the same time, the court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999) ("[T]he district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper.").

The Ninth Circuit has approved two methods of determining attorneys' fees in cases where, as here, the amount of the attorneys' fee award is taken from the common fund set aside for the entire settlement:  the "percentage of the fund" method and the "lodestar" method.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted).  The district court retains discretion in common fund cases to choose either method.  *Id.*  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion."  *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the court may award class counsel a given percentage of the common fund recovered for the class.  *Id.*  "The percentage method is particularly appropriate in common fund cases[ ] where 'the benefit to the class is easily quantified.'"  *Ontiveros*, 303 F.R.D. 372 (quoting *Bluetooth*, 654 F.3d at 942).  In the Ninth Circuit, a 25 percent award is the "benchmark" amount of attorneys' fees, but courts may adjust this figure upwards or downwards if the record shows "'special circumstances' justifying a departure."  *Id.* (quoting *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)).  When deciding if a departure from the 25 percent benchmark is appropriate, courts may consider "the result achieved, the risk involved in the litigation, the skill required and quality of work by counsel, the contingent nature of the fee, awards made in similar cases, and the lodestar crosscheck."  *Nwabueze v. AT&T Inc.*, Civ. No. 3:09-1529 SI, 2013 WL 6199596, at *10 (N.D. Cal. Nov. 27, 2013) ("*Nwabueze I*"); *see also In re Quintus Sec. Litig.*, 148 F. Supp. 2d 967, 973-74 (N.D. Cal. 2001) (noting that courts consider six factors when determining whether to adjust the benchmark percentage, including "(1) the result obtained for the class; (2) the effort

expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's loadstar").

In contrast to the benchmark method, determining the lodestar amount is "often more time-consuming[.]" *Bluetooth*, 654 F.3d at 942. Plaintiffs bring various state law claims, and under California law "[t]he primary method for establishing the amount of reasonable attorney fees is the lodestar method." *In re Vitamin Cases*, 110 Cal. App. 4th 1041, 1053 (2003) (internal quotation marks and citations omitted). The Court determines the lodestar amount by multiplying a reasonable hourly rate by the number of hours reasonably spent litigating the case. *See Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 (9th Cir. 2001). The Ninth Circuit recommends that district courts apply one method but cross-check the appropriateness of the amount by employing the other, as well. *See Bluetooth*, 654 F.3d at 944.

Because this case involves a common settlement fund with an easily quantifiable benefit to the class, the Court will primarily determine attorneys' fees using the benchmark method but will incorporate a lodestar cross-check to ensure the reasonableness of the award. *See Vizcaino*, 290 F.3d at 1047; *see, e.g.*, *Nwabueze v. AT&T, Inc.*, No. C 09-01529 SI, 2014 WL 324262, at *3 (N.D. Cal. Jan. 29, 2014) ("*Nwabueze II*"); *Ontiveros*, 303 F.R.D. at 372 (adopting a common fund benchmark model to determine attorneys' fees but using the lodestar method to cross-check the amount); *cf. LaGarde*, 2013 WL 1283325, at *12 (primarily using the lodestar method where the primary relief was injunctive and "the tangible benefits offered to the class have not reached the vast majority of class members").

### 1.   *Reasonableness of the Percentage*

As stated above, the Ninth Circuit has consistently approved a "benchmark" award of 25 percent of the common fund. *Bluetooth*, 654 F.3d at 947; *Staton*, 327 F.3d at 952; *Hanlon*, 150 F.3d at 1011; *Six (6) Mexican Workers*, 904 F.2d at 1311. Indeed, federal courts "have consistently approved of attorney fee awards over the 25% benchmark[,]" specifically at a rate of "30% or higher[.]" *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *18 n.12 (C.D. Cal. June 10, 2005). Here, although the settlement agreement provides that class

United States District Court
Northern District of California

1  counsel may be awarded up to 30 percent of the gross settlement amount—*i.e.*, $300,000 of the

2  $1,000,000 common fund—class counsel requests 25 percent—*i.e.*, $250,000—in attorneys' fees.

3  (Dkt. No. 77 at 8.)

4        Class counsel argues that an award of 25 percent of the common fund is appropriate here

5  given "the contingent nature of the litigation, the uncertainty surrounding many of the legal issues

6  involved, the results achieved, the experience of Plaintiff's counsel, the parties' agreement on the

7  issue of attorneys' fees, and the qualifications of opposing counsel." (Dkt. No. 77 at 16.)

8         With respect to the contingent nature of litigation, courts tend to find above-market-value

9  fee awards more appropriate in this context given the need to encourage counsel to take on

10  contingency-fee cases for plaintiffs who otherwise could not afford to pay hourly fees. *See, e.g.*,

11  *In re WPPSS Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994). This is especially true where, as

12  here, class counsel has significant experience in the particular type of litigation at issue; in such

13  contexts, courts have sometimes awarded even more than the 25 percent benchmark percentage of

14  the common fund. *See, e.g.*, *In re Heritage Bond Litig.*, 2005 WL 1594403, at *19 (awarding

15  attorneys' fees in the amount of 33 percent of the common fund). Moreover, when counsel takes

16  cases on a contingency fee basis, and litigation is protracted, the risk of non-payment after years of

17  litigation justifies a significant fee award. *See id.* Thus, that class counsel had significant

18  experience in this field and took on this matter on a contingent fee basis indicates that the 25

19  percent benchmark fee request is reasonable.

20        The results obtained and amount of work counsel performed on this case also support a

21  benchmark 25 percent award of attorneys' fees. *See Hensley v. Eckerhart*, 461 U.S. 424, 436

22  (1983) (noting that the "most critical factor" to the reasonableness of an attorney fee award is "the

23  degree of success obtained"). Here, class counsel achieved for the class a pre-certification

24  settlement after defending several motions to dismiss, amending the complaint, engaging in

25  significant discovery, an successfully negotiating a seven-figure settlement for the class. This

26  result will provide an average award of $450 per class member. The Court concludes that this

27  result renders the 25 percent benchmark attorneys' fee award reasonable.

28        Finally, "[t]he existence or absence of objectors to the requested attorneys' fee is a factor

United States District Court
Northern District of California

in determining the appropriate fee award." *In re Heritage Bond. Litig.*, 2005 WL 1594403, at *21 (citation omitted).  Here, despite having received notice of their right to object to the 30 percent attorney fee award set forth in the settlement agreement, not a single class member objected.  (*See* Dkt. No. 80-2 ¶ 7.)  The absence of objections or disapproval by class members to a 30 percent fee provides further support for the finding that the lower, 25 percent fee now requested is reasonable.

In short, all of the above factors indicate that class counsel's request for an attorneys' fee award in the amount of 25 percent of the common fund—*i.e.*, $250,000—is reasonable. Nevertheless, the Court will cross-check the requested fees against the lodestar.

2.      *Lodestar Cross-Check*

The Court now compares the benchmark amount to the lodestar, as calculation of this amount, "which measures the lawyers investment of time in the litigation, provides a check on the reasonableness of the percentage award." *Vizcaino*, 290 F.3d at 1050.  "The 'lodestar' is calculated by multiplying the number of hours . . . reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

"In determining the reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir. 1986), *amended on other grounds by* 808 F.2d 1373 (9th Cir. 1987).  The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  In terms of the reasonable amount of time spent, the Court should only award fees based on "the number of hours reasonably expended on the litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 433-34.  "There is no precise rule or formula for making these determinations[,]" and "[t]he court necessarily has discretion in making this equitable judgment." *Id.* at 436-37.

"Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and

United States District Court
Northern District of California

the contingent risk presented." *Thayer v. Wells Fargo Bank, N.A.*, 92 Cal. App. 4th 819, 833 (2001) (citation omitted).

The Court will first determine whether the hourly fee rate that led to that lodestar amount is reasonable, then will address the number of hours billed. Then the Court will compare the lodestar amount to the percentage-amount sought to determine whether it is reasonable in light of the lodestar.

a.   Reasonable Rate

"The first step in the lodestar analysis requires the court to determine a reasonable hourly rate for the fee applicant's services. This determination involves examining the prevailing market rates in the community charged for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (internal quotation marks and citation omitted); *see also Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). The "relevant community" for the purposes of determining the reasonable hourly rate is the district in which the lawsuit proceeds. *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997). "The fee applicant has the burden of producing satisfactory evidence . . . that the requested rate is in line with those prevailing in the community." *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987). In addition to affidavits from the fee applicant himself, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See Cotton*, 889 F. Supp. 2d at 1167 (citation omitted). However, the actual rate that the fee applicant charged is not evidence of the prevailing market rate. *Id.* (citing *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 808 (9th Cir. 1995)).

Here, class counsel seeks reimbursement for three attorneys with ranging levels of experience, all of whom work for Shaun Setareh's law firm, and practice almost exclusively in wage-and-hour class actions: Mr. Setareh himself, who acquired his J.D. in 1999, at a rate of $650 per hour; Tuvia Korobkin, who acquired his J.D. in 2009, at a rate of $425 per hour; and Neil Larsen, who acquired [his] J.D. in 2011, at a rate of $375 per hour. (Dkt. No. 77 at 19; *see also* Dkt. No. 77-1 ¶ 16.) All three attorneys have asserted that their requested rates are reasonable

21

1   based on rates recently awarded in wage-and-hour actions in the Central District of California.

2   (*See* Dkt. No. 77 at 20 (collecting cases).)

3         Class counsel next argues that the requested rates for two of the attorneys—Mr. Setareh

4   and Mr. Korobkin—is reasonable based on fee rates that prior courts have awarded them.  A judge

5   in Los Angeles Superior Court recently awarded Mr. Setareh fees at an hourly rate of $650 (Dkt.

6   No. 77-1 at Ex. D), which is evidence of the reasonableness of that rate.  *See Cotton*, 889 F. Supp.

7   2d at 1167.  Mr. Korobkin points to cases from 2013 and 2014 when courts awarded him fees at an

8   hourly rate of $350.  (Dkt. No. 77-6 ¶¶ 6-7 & Exs. A & B.)  He argues that $425 is more

9   appropriate now, given that the lower rate was awarded when he had less experience and litigated

10   mostly single-plaintiff lawsuits, whereas now he has more experience under his belt and litigates

11   almost exclusively class actions.  (*Id.* ¶ 8.)  The Court agrees that some increase may well be

12   appropriate, but perhaps not the full increase Mr. Korobkin seeks.

13         Class counsel next contends that these requested rates are reasonable based on the *Laffey*

14   matrix.  (*See also* Dkt. No 77-1 ¶ 17; No. 77-6 ¶ 8; Dkt. No. 77-7 ¶ 7.)  The *Laffey* matrix is a

15   compilation of attorney and paralegal rates in the Washington, D.C. area based on various levels

16   of litigation experience.  *See Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983),

17   *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984).  The *Laffey* matrix

18        has been regularly prepared and updated by the Civil Division of the United
19        States Attorney's Office for the District of Columbia and use in fee shifting cases,
     among others.  The *Laffey* matrix is especially useful when the work to be
20        evaluated was performed by a mix of senior, junior and mid-level attorneys, as
     well as legal assistants[.]

21

22   *Theme Promotions, Inc. v. News Am. Mktg. PSI, Inc.*, 731 F. Supp. 2d 937, 947 (N.D. Cal. 2010)

23   (internal citation omitted).  But "[t]he rates posted in the *Laffey* matrix are tailored for the District

24   of Columbia, which has a different cost of living index from the San Francisco, California Bay

25   area," where this case was litigated.  *Id.*  Thus, the *Laffey* matrix itself is of limited significance to

26   rates in this District.  In fact, "[t]he Ninth Circuit has questioned the relevance of the *Laffey* matrix

27   to determining a reasonable rate in the Bay Area."  *J&J Sports Prods., Inc. v. Ortiz*, No. 12-CV-

28   05766-LHK, 2014 WL 1266267, at *3 n.1 (N.D. Cal. Mar. 24, 2014) (citing *Prison Legal News v.*

United States District Court
Northern District of California

22

United States District Court
Northern District of California

1   *Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010)).  But even including the cost-of-living

2   increase that class counsel includes, while the adjusted *Laffey* matrix suggests that Mr. Setareh's

3   $650 hourly rate is proper, the rate for an attorney with six years of experience, like Mr. Korobkin,

4   is only $402.43.  (*See* Dkt. No. 77 at 22.)   Thus, reference to the *Laffey* matrix, even as adjusted,

5   supports an award at an hourly rate of $400 for Mr. Korobkin, not $425.  This is especially true

6   given that, while courts in this District on occasion have used the *Laffey* matrix as an objective

7   source for setting hourly rates, they have declined to do so for counsel from small firms like class

8   counsel's, which are "generally awarded fees based on lower rates[.]"  *Lazaro v. Lomarey Inc.*,

9   No. C-09-02013, 2012 WL 2428272, at *2 (N.D. Cal. June 26, 2012) (citation omitted).

10          In any event, class counsel insists the *Laffey* matrix rates are reasonable when adjusted

11   upward to meet the cost of living standards in the Central District of California (*see* Dkt. No. 77 at

12   19), but the district where the case was litigated, the Northern District of California—not the

13   District of Columbia or the Central District of California—is the "relevant community" for

14   purposes of determining whether a reasonable hourly rate.[6]  *See Gates*, 987 F.2d at 1405.  Class

15   counsel has not submitted an affidavit from any attorney that worked on this case or from any

16   other attorney attesting to the prevailing rates in the Northern District of California for

17   representation of wage-and-hour class actions by lawyers of reasonably comparable skill,

18   experience, and reputation.  *See Davis*, 976 F.2d at 1546.  Nor has class counsel submitted any

19   evidence of hourly rate determinations in other class action wage-and-hour cases in this District

20   setting the rate for attorneys' fees.  *See J&J Sports Prod. Inc.*, 2014 WL 1266267, at *3.

21          The Court has conducted its own review, and found that other courts in this District have

22   determined that rates ranging from $250 to $700 are appropriate in wage-and-hour class actions

23   for attorneys with similar length of experience.  *See, e.g., Greko v. Diesel U.S.A., Inc.*, No. 10-cv-

24   02576 NC, 2013 WL 1789602, at *10-11 (N.D. Cal. Apr. 26, 2013) (approving hourly rates for

25

─────────────────────────

26   [6] There is an exception to the local forum rule.  "[R]ates outside the forum may be used if local
     counsel was unavailable, either because they are unwilling or unable to perform because they lack
27   the degree of experience, expertise, or specialization required to handle properly the case."  *Baron
     v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (internal quotation marks and citation omitted).
28   Class counsel has not suggested that local counsel was unavailable, so this exception does not
     apply.

attorneys ranging from $300 to $700 in wage-and-hour class action); *Wren v. RGIS Inventory Specialists*, No. at *19 (N.D. Cal. Apr. 1, 2011) (approving a $650 hourly rate for class counsel in wage-and-hour case with 17 years of legal experience and other rates for attorneys with less experience ranging from $325 to $625); *Navarro v. Servisair*, No. C 08-02716 MHP, 2010 WL 1729538, at *3 (N.D. Cal. Apr. 27, 2010) (awarding rates between $250 and $350 for counsel representing plaintiffs in wage-and-hour class action). Notably, some courts have capped fees even for experienced partner counsel below Mr. Setareh's requested rate here. *See, e.g.*, *Berry v. Urban Outfitters Wholesale, Inc.*, No. 13-cv-02628-JSW (KAW), 2015 WL 580579, at *4 (N.D. Cal. Feb. 11, 2015) (rejecting partner's requested hourly rate of $550 in wage-and-hour class action and instead awarding at a rate of $400 per hour); *Postier v. Louisiana-Pac. Corp.*, No. 09-CV-03290-JCS, 2014 WL 1760010, at *5 (N.D. Cal. Apr. 29, 2014) (awarding partner at national litigation firm with over 20 years of experience $425 per hour).

Based on the fees regularly awarded in comparable actions in this district, and the fact that the three attorneys practice almost exclusively in the field of wage-and-hour class actions, the Court concludes that Mr. Setareh's $650 requested rate is reasonable, Mr. Korobkin should be awarded fees at a rate of $400 per hour, and Mr. Larsen's requested rate of $375 per hour is reasonable.

b.   Reasonable Hours

Over the one year and nine months of this litigation, class counsel has billed 303 hours. (*See* Dkt. No. 77 at 22.) Class counsel defended multiple motions to dismiss and amended the complaint accordingly. Moreover, to approach the bargaining table in a properly informed position, class counsel reviewed hundreds of pages of documents and worked with experts to reach a model for determining Defendant's ultimate exposure to liability. These tasks, unsurprisingly, took time.

The majority of hours were billed by Mr. Setareh, who is lead class counsel and has the most experience in wage-and-hour class actions. (*See* Dkt. No. 77 at 2; Dkt. No. 77-1 ¶ 4.) In his declaration, Mr. Setareh provides a long list of tasks that he did in this case from start to finish, including interviewing Plaintiff and investigating his claims to determine which claims to bring,

drafting the initial complaint, opposing multiple motions to dismiss and drafting amended complaints, propounding discovery and reviewing Defendant's discovery responses, retaining and working with an expert economist to create a damages model, traveling to San Francisco to represent Plaintiff at court appearances, drafting a mediation brief, supervising his associates, communicating with Plaintiff over the course of the litigation, and drafting the instant motions for approval of settlement and fees.  (Dkt. No. 77-1 ¶ 15.)  Mr. Korobkin billed 72 hours on this case, consisting primarily of reviewing the case file and discovery, communicating with Plaintiff and co-counsel, and drafting the motions for approval and for attorneys' fees and associated documents.  (Dkt. No. 77-6 ¶ 4.)  Mr. Larsen, for his part, billed 43 hours in this matter, which he spent reviewing the case file and discovery, communicating with co-counsel, and assisting in drafting the motions for approval of settlement and for attorneys' fees and costs and associated documents.  (Dkt. No. 77-7 ¶ 5.)  Class counsel did not submit billing records to substantiate their assertions about the hours worked; rather, they have submitted only their sworn, written descriptions detailing the projects and tasks each lawyer completed.  (*See* Dkt. Nos. 77-1 ¶ 15, 77-6 ¶ 4, 77-7 ¶ 5.)  However, it is well established that "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean counting . . . [courts] may rely on summaries submitted by the attorneys and need not review actual billing records."  *Covillo*, 2014 WL 954516, at *6 (citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2004)).  Given the sworn declarations that counsel submitted describing each of their tasks, and in light of the complex nature of a class action lawsuit and the favorable result obtained, the Court accepts class counsel's explanation of fees as reasonable.  This is especially true where, as here, the Court is not using the lodestar to determine the actual amount of fees to be awarded, but rather merely as a cross-check to the percentage-of-the-fund amount sought.  The Court therefore concludes that the number of hours that class counsel expended is reasonable given the length of this lawsuit and the disputes that arose over the course of this litigation.

### c.   Lodestar Calculation

Here, applying the reasonable hourly fees that class counsel is seeking to the number of hours reasonably billed, class counsel's lodestar calculation is $167,125.  (*See* Dkt. No. 77 at 19.)

After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier. *See Hopkins v. Stryker Sales Corp.*, No. 11-CV-02786-LHK, 2013 WL 496358, at *4 (N.D. Cal. Feb. 6, 2013) (citation omitted). "The purpose of this multiplier is to account for the risk Class Counsel assumes when they take on a contingent-fee case." *Id.* (citation omitted). If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are, in fact, reasonable. *Id.* In determining whether a multiplier is appropriate, courts consider the following factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* (citations omitted). "Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases." *Hopkins*, 2013 WL 496358, at *4 (citation omitted); *see also Vizcaino*, 290 F.3d at 1051 n.6 (finding that, in approximately 83 percent of the cases surveyed by the court, the multiplier was between 1.0 and 4.0 with a "bare majority . . . 54% . . . in the 1.5—3.0 range").

Here, based on the lodestar amount of $168,925, if the Court were to grant class counsel's request for a 25 percent award, the multiplier would be 1.49. In light of the results of this action, the contingent nature of class counsel's fee arrangement, and the skill required in conducting this litigation properly and succeeding at settlement, the Court believes that the 1.49 multiplier—at the low end of the Ninth Circuit's scale—is appropriate. *See Vizcaino*, 290 F.3d at 1051 n.6. This is especially true given that the percentage sought is at the presumptively reasonable benchmark amount in this Circuit. Thus, the attorneys' fees requested are reasonable and the Court will award class counsel the $250,000 it seeks.

    B.    <u>Litigation Costs</u>

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros*, 303 F.R.D. at 375 (citations omitted). To that end, courts throughout the Ninth Circuit regularly

United States District Court
Northern District of California

United States District Court
Northern District of California

1  award litigation costs and expenses—including reasonable travel expenses—in wage-and-hour

2  class actions.  *See, e.g.*, *id.*; *Nwabueze II*, 2014 WL at 324262, *2; *LaGarde*, 2013 WL 1283325,

3  at *13.  The settlement agreement provides that class counsel may obtain up to $30,000 in costs.

4  (Dkt. No. 69-2 ¶ 9.1.)  Here, appointed class counsel has submitted a list of itemized costs totaling

5  $21,747.28 relating to this litigation, ranging from filing and printing fees, to costs associated with

6  hiring an economic expert consultant, to hotels and travel costs associated with court appearances

7  in San Francisco.  (Dkt. No. 77-3.)   The Court concludes that these are reasonable litigation

8  expenses incurred for the benefit of the class.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.

9  1994) (noting that a prevailing plaintiff may be entitled to costs including, among other things,

10  "postage, investigator, copying costs, hotel bills, meals," and messenger services).  Moreover,

11  these costs are reasonably proportionate to the amount of attorneys' fees when compared to similar

12  settlements.  *See, e.g.*, *Navarro*, 2010 WL 1729538, at *3 (awarding $11,000 in costs in

13  conjunction with $180,000 in attorneys' fees); *Odrick v. UnionBancal Corp.*, No. C 10-5565 SBA,

14  2012 WL 6019495, at *7 (N.D. Cal. Dec. 3, 2012) (awarding $20,000 in costs in conjunction with

15  $875,000 attorneys' fees); *Tarlecki v. bebe Stores, Inc.*, No. CV-05-1777 MHP, 2009 WL

16  3720872, at *6 (N.D. Cal. Nov. 3, 2009) (awarding $30,000 in costs in conjunction with $200,000

17  in attorneys' fees).  The Court therefore will grant class counsel's request for compensation in the

18  amount of $21,747.28.

19      C.      Administration Costs

20          Plaintiff also requests reimbursement of $16,500 for the cost of paying Rust Consulting,

21  Inc. to serve as claims administrator.  (Dkt. No. 77 at 24.)  From Plaintiff's perspective, this

22  payment is appropriate because "[w]ithout Rust's work on this case, Class members would not

23  have received notice of the Settlement, nor would they receive their share of the Settlement

24  proceeds."  (*Id.*)  In support of this request, Plaintiff submitted the declaration of Stacy Roe,

25  Rust's Senior Project Administrator, who provides detailed descriptions of the work that Rust did

26  in this case.  (Dkt. No. 77-8.)  Rust's work included printing the Notice of Settlement and

27  associated documents; setting up an address, phone and fax numbers, and website to be included

28  in the notice; sending out the notice by mail and e-mail; performing skip-traces to obtain updated

addresses for notices returned as undeliverable; receiving and maintaining settlement allocation forms or exclusion forms; and monitoring objections to the settlement.  (*See generally id.*) According to, the total cost for the administration of the settlement, including fees and costs, is estimated to be $16,500.  (*Id.* ¶ 19.)  Courts regularly award administrative costs associated with providing notice to the class.  *See, e.g.*, *Odrick*, 2012 WL 6019495, at *7.  The Court therefore concludes that Rust's costs were reasonably incurred for the benefit of the class and awards the full amount.

      D.    <u>Incentive Award</u>

Plaintiff also requests that the Court approve an incentive payment in the amount of $15,000 to be awarded to Bellinghausen as named plaintiff, along with a $5,000 payment for releasing all claims against Defendant.  (Dkt. No. 77 at 24.)

"Incentive awards are fairly typical in class action cases."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009).  However, the decision to approve such an award is a matter within the Court's discretion.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000).  Generally speaking, incentive awards are meant to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez*, 563 F.3d at 958-59.  The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives . . . .  [C]oncerns over potential conflicts may be especially pressing where, as here, the proposed service fees greatly exceed the payments to absent class members.  *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted).  In determining whether an incentive award is reasonable, courts generally consider

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

*Covillo v. Specialtys Café*, No. C-11-00594 DMR, 2014 WL 954516, at *7 (N.D. Cal. Mar. 6,

United States District Court
Northern District of California

1    2014) (citing *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (citations

2    omitted).

3           A class representative must justify an incentive award through "evidence demonstrating

4    the quality of plaintiff's representative service," such as "substantial efforts taken as class

5    representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs."

6    *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).  In this district, a $5,000 payment is

7    presumptively reasonable.  *See, e.g.*, *Burden v. SelectQuote Ins. Servs.*, No. C 10-5966 LB, 2013

8    WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013); *Hopson v. Hanesbrands, Inc.*, No. CV-08-0844,

9    2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009).  Incentive awards typically range from $2,000

10   to $10,000.  *See, e.g.*, *Covillo*, 2014 WL 954516, at *8 (ordering an $8,000 incentive award for

11   each of the three named plaintiffs); *Wolph v. Acer Am. Corp.*, No. 09-01314 JSW, 2013 WL

12   5718449, at *6 (N.D. Cal. Oct. 21, 2013) (ordering a $2,000 incentive award for each named

13   plaintiff); *Chu v. Wells Fargo Invs., LLC*, Nos. C 05-4526 MHP, C 06-7924 MHP, 2011 WL

14   672645, at *5 (N.D. Cal. Feb. 16, 2011) (awarding a $10,000 incentive award to two named

15   plaintiffs).  Higher awards are sometimes given in cases involving much larger settlement

16   amounts.  *See Chu*, 2011 WL 672645, at *5 (collecting cases); *see, e.g.*, *Glass v. UBS Fin. Servs.*,

17   No. C 06-4068 MMC, 2007 WL 221862, at *16-17 (N.D. Cal. Jan. 26, 2007) (approving a

18   $25,000 incentive award to four plaintiff representatives in a $45 million settlement); *Van*

19   *Vranken*, 901 F. Supp. at 299 (approving $50,000 award in $76,723,213.26 settlement amount).

20   Incentive awards are particularly appropriate in wage-and-hour actions where plaintiffs undertake

21   a significant "reputational risk" by bringing suit against their former employers.  *Rodriguez*, 563

22   F.3d at 958-59.

23          Here, Plaintiff requests a $20,000 award—that is, a $15,000 incentive award coupled with

24   a $5,000 payment for releasing all claims against Defendant.  (*See* Dkt. No. 77 at 24; *see also* Dkt.

25   No. 69-2 ¶¶ 9.2, 9.4.)   This award is nearly four times the amount that is deemed presumptively

26   reasonable in this District.  *See, e.g.*, *Burden*, 2013 WL 3988771, at *6; *Hopson*, 2009 WL

27   928133, at *10.  It is also 2 percent of the gross settlement funds, which is higher than what other

28   courts have found acceptable.  *See Sandoval v. Tharaldson Emp. Mgmt., Inc.*, No. EDCV 08-482-

United States District Court
Northern District of California

VAP (OPx), 2010 WL 248346, at *10 (C.D. Cal. June 15, 2010) (collecting cases and concluding that plaintiff's request for an incentive award representing one percent of the settlement fund was excessive). The amount of the award seems all the more excessive and less reasonable in light of the discrepancy it will create between Plaintiff's take-home compared to the award other members of the class will earn, *see Alberto*, 252 F.R.D. at 669: compared to Plaintiff's $20,000, the average estimated settlement award for class member is just over $450, while the highest estimated award for a single class member is just over $3,250. (*See* Dkt. No. 77-8 ¶ 17.)

In support of his argument that this $20,000 award is appropriate, Plaintiff has submitted a declaration that outlines the work he has done on this case. (Dkt. 79.) Plaintiff's declaration has addressed the factors the Court must consider in determining the reasonableness and appropriateness of an incentive award. *See Covillo*, 2014 WL 954516, at *7. Plaintiff requests a $20,000 fee-- $15,000 incentive award and $5,000 for release of claims—on the ground that he repeatedly put the class members' interest on par with—or even above—his own; for example, he asserts that he rejected Defendant's offer of an individual settlement that would have exceeded $20,000, and instead proceeded with this action to obtain compensation for the entire class. (*Id.* ¶ 7.) This case has been pending for one year and nine months. During this nearly two-year period, Plaintiff has spent 73 hours on this case, including travel time, during which he might have otherwise spent time with family, working or pursuing other personal matters. (*Id.* ¶ 9.) His time has been spent retaining and speaking with counsel, reviewing documents pertaining to Defendant, assisting counsel in preparing for mediation, traveling to Los Angeles for the mediation session, and engaging in settlement negotiations. (*Id.*) In addition, Plaintiff avers that he has lost job opportunities due to his role as class representative: "[m]ultiple prospective employers – including CalTrans and Kohl's – sent [him] correspondence indicating that [his] application for employment was rejected because of his 'pending litigation' with [his] former employer—*i.e.*, this case." (*Id.* ¶ 10.) In addition to these rejections, Plaintiff notes that his status of class representative will cause him harm in the future—more harm than even the requested incentive award might address—because when future employers or others search for his name online, this case, including the specific allegations, is available on the internet. (*Id.* ¶ 11.) Finally, Plaintiff

United States District Court
Northern District of California

filed this lawsuit despite knowledge that if he lost, the court might have ordered him to pay Defendant's attorneys' fees and costs.  (*Id.* ¶ 12.)

Having reviewed Plaintiff's declaration, the Court finds that a substantial incentive award is appropriate here in light of the time and effort Plaintiff expended for the benefit of the class—at times, to his own personal detriment—and the risks associated with initiating the litigation and representing the class.  At the same time, the total settlement amount, at $1,000,000, does not justify the $20,000 that Plaintiff seeks. *Cf. Glass*, 2007 WL 221862, at *16-17; *Vranken*, 901 F. Supp. at 299.  Accordingly, the Court will award Plaintiff $15,000, amounting to an above-average $10,000 incentive award and the parties' agreed-upon $5,000 release of claims.

## CONCLUSION

For the reasons described above, the Court GRANTS Plaintiff's motion for final approval of the parties' Settlement.  In addition, the Court GRANTS IN PART Plaintiff's motion for attorneys' fees, costs, and incentive award.  Specifically, the Court awards the following costs: $250,000 in attorneys' fees; $21,747.28 in litigation costs; $16,500 to the settlement administrator, Rust Consulting; and $15,000 to Plaintiff as class representative.

The Clerk is directed to close this case.

This Order disposes of Docket Numbers 77 and 80.

**IT IS SO ORDERED.**

Dated:  March 19, 2015

_____
Jacqueline Scott Corley
United States Magistrate Judge

United States District Court
Northern District of California

31